## McCREARY v. COGGESHALL.

1. REHEARING ordered.
2. WILLS—LIMITATIONS OF ESTATES—MERGER—NOTICE—ISSUES.—Devise to A. for life and in case A. die leaving issue of the body, then to such issue in fee, but in default of issue, to B. in fee vests fee after life estate in B. with the contingent remainders limited thereon, and if B. acquires the life estate, the contingent remainders are thereby merged into the fee, but merger will not take place if contrary to the intention of the parties, and this rule applies both in equity and at law. Cases considered. If a grantee of A. had acquired title without notice of intention against merger, would merger be held to have taken place as to him? The act of 1883, Code 1902, 2465, would not include a case of this kind.

3. Evidence—Writings.—A letter written seventy years ago is an ancient document and requires no proof, but its genuineness may be proved by a comparison with writings of the author known to be genuine.

4. Probate of Deed sworn before George Bruce, U. Q., is valid, as at its date, 1820, clerks of Court were *ex officio* Justices of the Quorum, the letters U. Q. signifying *Unum Quorum*, George Bruce being at that time clerk of the Court, but omission of official title of officer taking probate does not affect it.

5. Real Property—Nonsuit.—Letters of defendant grantee in connection with the several deeds; parol evidence of the successive possessions and admissions of those who held successively, were evidence sufficient to justify the Court in not granting nonsuit, on ground of total failure of proof of *locus in quo*.

6. Ibid.—New Trial as to both defendants was properly refused, because the evidence establishing title against the one presumptively showed title out of the other, although he claimed from a different source.

Before Aldrich, J., Darlington, Fall Term, 1904. Affirmed.

Action by Jas. H. McCreary, John A. McCreary, Sue H. Hawthorne, J. R. Hawthorne, Mary H. McClelland, J. J. McClelland and Mattie E. Massey against A. C. Coggeshall, W D. Coggeshall and George Morrell. From judgment for plaintiffs, defendants appeal.

*Messrs. Dargan & Coggeshall* and *Woods & Macfarland,* for appellant. The former cite: *The rules governing merger at law and in equity are different:* 15 Ency., 314-5; 47 S. C., 297; 57 S. C., 182; 64 S. C., 193; 16 Cyc., 665; 20 Ency., 2 ed., 588; 16 S. C., 330; 28 S. C., 486; 23 S. C., 315. *Mere intention or interest of parties does not prevent merger in this State:* 16 S. C., 330; 28 S. C., 486; 24 S. C., 18; 26 S. C., 414, 429; 27 S. C., 562; 52 S. C., 385; 28 S. C., 453; 57 S. C., 385. *The intent must have existed when the two estates came together:* 15 Ency., 1 ed., 315; 26 S. C.. 429, 414.

*Messrs. Woods & Macfarlan* cite: *Issue of Mary Ann Coleman were contingent remaindermen:* 10 S. C., 389, 392; 16 Cyc., 648, 650; 24 Ency., 401, 417; Dud. Eq., 120; Rice Eq., 459; 3 S. & R., 361. *Contingent remainders may be destroyed by different methods:* Tied. on Real Prop., 419-21; 2 Wash. on Real Prop., 638; 16 Cyc., 655; 24 Ency., 410-13; 16 S. C., 170; 17 Am. St. R., 439; 60 Am. R., 381. *When destroyed by merger:* Tied. on Real Prop., 421; 1 Fearne on Rem., 340-1; 4 Kent's Com., 254; 1 Wash. on Real Prop., 155; 2 Saund., 380; Dud. Eq., 115; Rice Eq., 459; 60 Am. R., 395; 16 S. C., 316; 28 S. C., 486; 54 S. C., 426. *Morris W. Hunter took inheritance upon death of testator until contingency happened:* Rich. Eq. Cas., 274; 10 S. C., 428; 60 Am. R., 388. *Evidence by comparison of handwriting as original evidence incompetent here:* 2 McC., 518; 1 McM., 125; 5 S. C., 478; 18 S. C., 507. *Record of deed not properly rceorded is no proof of its existence:* 22 S. C., 238; 43 Am. Dec., 33; 1 Whart. Ev., sec. 115; 2 Watts, 78; 2 Binney, 44.

*Messrs. H. H. McClelland* and *Spears & Dennis,* contra.

An opinion was filed in this case on the 21st day of October, 1905, but on petition for rehearing the following order was made:

November 2, 1905. PER CURIAM. Since the hearing and decision of this cause, Mr. Justice Woods has recalled the fact, which he had entirely overlooked, that the question of the effect of section 109 of the Code of Procedure on the rights of remaindermen was involved in a cause pending in the Court of Common Pleas in which he had been one of counsel. The views of the Court on this point are not questioned in the petition for rehearing, but at the request of Mr. Justice Woods, made for the reason above stated, the cause is opened so that argument on this point may be heard by the Court without his participation.

As the cause is to be reopened, counsel will be heard also on the issues referred to in the petition for rehearing.

It is, therefore, ordered, that the cause be set down for rehearing at the November Term, 1905, of this Court, upon the call of the Fourth Circuit.

The case was reargued at November Term, 1905. MR. JUSTICE WOODS sitting at the request of all counsel, the question of the effect of section 109 of Code of Proc. on rights of remaindermen having been withdrawn.

March 15, 1906. The opinion of the Court was delivered by

MR. JUSTICE WOODS. A judgment was recovered by the plaintiffs for the possession of a tract of land containing 630 acres, and defendants appeal. As it is necessary at every point of the discussion to have in view the precise terms of certain portions of the will of Thomas Hunter, under which both parties claim title, they are here set out in full: "Item. *I lend to my grand-daughter, Mary Ann Coleman, for and during the term of her natural life and no longer, all my lands situate, lying and being on Belly Ache* including George King's old place, and also Henry King's supposed to contain nine hundred acres, and also four negroes, Carolina, Sarah and her two children, and the future issue and increase of the females. It is my will and desire that my executors retain and manage the said land and negroes for the benefit of my grand-daughter until she arrives to the age of twenty-one or marriage, and then to be delivered over to her: *and in case my said grand-daughter, Mary Ann Coleman, should die leaving issue of her body then living, then to him or her, or them so living, and to their heirs and assigns forever; but in case the said Mary Ann Coleman should die leaving no issue of her body living at the time of her death, then I give, devise and bequeath all the aforesaid land and negroes to my son, Morris W. Hunter, his heirs and assigns forever.*

"Item. *I give, devise and bequeath unto my son, Morris W. Hunter, his heirs and assigns forever, all the rest and residue of my real and personal estate of what kind or nature soever, and wheresoever situate or being,* and also, after the death of my wife, Margaret Hunter, I give, devise and bequeath all the real and personal estate hereinbefore loaned to her, to him the said M. W. Hunter, his heirs and assigns forever.

"Lastly. I do hereby nominate my son, Morris W. Hunter, and my friends, Samuel Bacot and James R. Ervin, executors of this my last will and testament."

We have italicized the portions requiring special attention. Thomas Hunter died about 1831, leaving surviving him his children, William, Morris and Rachel, and his grand-child, Mary Ann Coleman. Mary Ann Coleman married Samuel McCreary, and died in 1902, at the age of ninety years, leaving surviving, her children, the plaintiffs, J. H. McCreary, J. A. McCreary, Susan Hawthorne, Mary McClelland and Mattie Massey, who now claim the land in dispute as "issue of her body living" at the time of her death, under the second item of the will. We first consider the case on the assumption that there was evidence to the effect that Morris W. Hunter, one of the heirs and the residuary devisee of Thomas Hunter, acquired title to the life estate of Mary Ann McCreary, *nee* Coleman, and that the defendants, or at least one of them, derived title to the land and possession of it through him. The defendants, taking the position that the plaintiffs took under the will a remainder contingent on surviving their mother, the life tenant, the fee being in Morris W. Hunter, the residuary devisee, pending the contingency upon which plaintiffs should take, contended if Morris W. Hunter, owner of the fee, did acquire the life estate of Mary Ann Coleman, it became immediately merged in the fee, which he already held, and the contingent remainder being thus left without any particular estate to support it, would be defeated. The Circuit Judge refused to so charge, but on the contrary in-

structed the jury the contingent remainder intervening between the life estate and the fee prevented a merger.

There can be no doubt that the limitation to the issue of Mary Ann Coleman, and, in default of such issue, to Morris W. Hunter, created a contingent remainder with a double aspect, and not an executory devise. It is said in Fearne on Remainders, 393-395: "Lord Mansfield, in the voice of the Court, said it was perfectly clear and settled that where an estate can take effect as a remainder, it shall never be construed an executory devise or springing use. And Lord Kenyon, Chief Justice, in delivering the opinion of the Court, said, if ever there existed a rule respecting executory devises which had uniformly prevailed without any exception to the contrary, it was that which was laid down by Lord Hale, in the case of Purefoy v. Rogers, that where a contingency is limited to depend on an estate of freehold which is capable of supporting a remainder, it shall never be construed to be an executory devise, but a contingent remainder only and not otherwise. From the last noticed case, and that of Hopkins v. Hopkins therein referred to, it appears that where the contingent estate may, in the nature of its original limitation, take effect during, or by the time of the determination of, the particular estate (supposing that particular estate to take place), the possibility or probability of its not doing so, in the common course of things, or from its relation to other limitations, interposed by the testator, will not take it out of the general rule that denies the construction of an executory devise to a limitation that may take effect as a contingent remainder." This is conclusive against the contention of the respondent. A reading of the will shows that the limitation to the children of Mary Ann Coleman who survived her would take effect, if at all, at her death. Mary Ann Coleman's life estate was the particular estate to support the remainder, which could take effect immediately on its determination; hence under the rule stated by Mr. Fearne it could not be an executory devise. *McElwee* v. *Wheeler*,

10 S. C., 392; *Faber* v. *Police,* 10 S. C., 376; Fearne on Rem., 373; 2 Wash. on Real Prop., 625.

The residuary devise to Morris W. Hunter vested in him the fee after the life estate, with the contingent remainders limited thereon. *Hopkins* v. *Mazyck,* Rich. Eq. Cases, 263; *Williams* v. *Kibler,* 10 S. C., 414.

The general rule that a life estate is drowned or merged in the fee when acquired by the owner of the fee to the destruction of an intervening contingent remainder is too deeply imbedded in the common law to be now judicially questioned. Whenever this application of the doctrine of merger has been under discussion by writers on the common law, the leading case of *Purefoy* v. *Rogers,* decided in 1672, and reported in 2 Saunders, 380, in which the doctrine is laid down, has been followed. The rule is thus comprehensively stated in 2 Wash. on Real Prop., 638: "At common law, there were various ways in which a contingent remainder might be defeated, by destroying the particular estate on which the remainder depended before it vested. It might be done by a feoffment or forfeiture, or by the inheritance descending upon the tenant and merging his particular estate in itself, or by the particular estate and the inheritance becoming united by conveyance or act of the parties, since the outstanding of a contingent remainder would not prevent the merging of the two, it not being an intervening estate." It is remarkable that a somewhat careful search has disclosed very few cases in American courts in which the precise point was involved. In a text book of high rank our own case of *Mangum* v. *Piester,* 16 S. C., 316, is cited as authority for the proposition, that "where the particular estate merges in inheritance either by the act of the particular tenant or by the descent to him of the inheritance after the particular estate has taken effect, intermediate contingent remainders are destroyed."

It is true, the Court held in that case a life estate became merged in the remainder when it was purchased by the remainderman, but the remainder there under discussion was

held to be vested and the limitation over an executory devise, and not a contingent remainder. The subject of the barring of intervening contingent remainders by merger could not therefore arise, and was neither discussed nor decided. Nor was the precise point here under consideration necessarily involved in *Bouknight* v. *Brown*, 16 S. C., 155, 170, as will be found on examination of the facts of the case, but in the course of the discussion the Court uses this language: "A contingent remainder may be destroyed at common law by fine or recovery, by merger of the particular estate, or by any *displacement* thereof, and this is the great and essential difference between a contingent remainder and executory devise." *Redfern* v. *Middleton*, Rice, 459, decided that alienation by the life tenant by deed of feoffment with livery of seizin operated as a forfeiture of the life estate, resulting in the destruction of the contingent remainder depending upon the life estate as the particular estate supporting it. To the same effect are *Faber* v. *Police*, 10 S. C., 376; *McElwee* v. *Wheeler*, 10 S. C., 392; and *Snelling* v. *Lamar*, 32 S. C., 72, 10 S. E., 825. While the possibility of destroying contingent remainders by merger was not involved in those cases, yet forfeiture, by deed of feoffment, with the livery of seizin, and merger, have equal common law sanction as methods of barring contingent remainders, and the remarks of Chief Justice McIver, in *Bank* v. *Garlington*, 54 S. C., 413, 426, 32 S. E., 513, as to the former, apply also to the latter: "There is no doubt that under the common law of England a tenant for life could bar contingent remainders by executing a deed of feoffment, with livery of seizin, and there is as little doubt that this portion of the common law became a part of the law of this State by virtue of the act of 1712, incorporated in the Gen. Stat. of 1882 as sec. 2738."

The act of 1883 (18 Stat., 430, Civil Code, sec. 2465) provides that "no estate in remainder, whether vested or contingent, shall be defeated by any deed of feoffment with livery of seizin." However unfortunate it may be regarded

4—74

that our statute was not modeled after the English statute, 8 and 9 Vict., c. 106, and thus made comprehensive enough to prevent the unjust destruction of the rights of contingent remaindermen by merger and other artificial means, the Court cannot extend the statute beyond its plain meaning. But even if the statute had expressly provided against the destruction of contingent remainders by merger, it could have no effect to defeat a right acquired by merger before the enactment of the statute. Here, if Morris W. Hunter acquired the preceding life estate, and thus defeated the contingent remainder, this was accomplished and his rights and the rights of those claiming under him were vested long before the act was passed. The possibility of defeating it might have been taken away by statute, but after it had been actually destroyed and the entire unlimited title acquired by Hunter, his title could not be altered by statute. *Bank v. Garlington,* 54 S. C., 429, 32 S. E., 513. The Circuit Judge was, therefore, in error in saying to the jury that the life estate could not merge in the fee because of the intervening contingent remainder; but the unsoundness of the reason given manifestly could not avail appellants if merger was prevented by any other circumstance appearing from the undisputed evidence. This brings us to the difficult inquiry as to the effect of the intention of the parties.

Inasmuch as there seems to be considerable doubt as to the state of the law on this subject in South Carolina, a statement of the rule obtaining elsewhere and a brief review of our decisions seems desirable.

The view generally held is that merger is not favored in the courts of law or equity; and in equity at least it will not take place if opposed to the intention of the parties either actually proved or implied from the fact that merger would be against the interest of the party in whom the several etsates or interests have united. This doctrine is sustained by an unbroken current of authority in the other States of the Union and in England. *Forbes* v. *Moffett,* 18 Ves., 384; *Ins. Co.* v. *Murphy,* 111 U. S., 738; *Welsh* v. *Phillips,*

25 Am. Rep., 679 (Ala.); *Jackson* v. *Relf,* 8 So., 184 (Fla.); *Knowles* v. *Lawton,* 63 Am. Dec., 290 (Ga.); *Westheimer* v. *Thompson,* 32 Pac., 205 (Idaho); *Temple* v. *Whittier,* 7 N. E., 642 (Ill.); *Thomas* v. *Simmons,* 2 N. E., 204 (Ind.); *Shimer* v. *Hammond,* 1 N. W., 656 (Ia.); *Bank* v. *Webb,* 23 N. W., 51 (Mich.); *Horton* v. *Maffitt,* 100 Am. Dec., 222 (Minn.); *Bassett* v. *O'Brien,* 51 S. W., 107 (Mo.); *Matthews* v. *Jones,* 66 N. W., 622 (Neb.); *Salvage* v. *Haydock,* 44 Atl., 696 (N. H.); *Gore* v. *Brian,* 35 Atl., 897 (N. J.); *Gardner* v. *Astor,* 3 Johns Ch., 53 (N. Y.); *Watson* v. *Mortgage & Investment Co.,* 8 Pac., 548 (Oregon); Bryar's Appeal, 2 Atl., 344 (Pa.); *Dodge* v. *Hogan,* 31 Atl., 268 (R. I.); *Hapgood Shoe Co.* v. *Bank,* 56 S. W., 995 (Tex.); *Carpenter* v. *Gleason,* 4 Atl., 706 (Vermont); *Rorer* v. *Ferguson,* 31 S. E., 817 (Va.); *Stewart* v. *Eaton,* 55 Pac., 314 (Wash.).

It is argued, however, that the rule is different in this State, and that something more than even actual proof of the intention, as a part of the principal contract from which merger would usually result, is necessary to prevent it; that an express contract separate and distinct must be proved. It cannot be denied our cases are in some confusion, and it is therefore desirable to reconcile them as far as possible and state the true rule.

In none of our earlier cases on the subject of merger is the effect of intention considered, and we, therefore, commence with the case of *Agnew* v. *R. R. Co.,* 24 S. C., 18. In this case it was not necessary to go further than to hold that an express separate agreement incorporated in the deed made to the mortgagee that the mortgage should remain open for his protection prevented merger; but effect was given to this paper not because it was incorporated in the deed or was in writing, but as the expression of an intention that the mortgage should not merge. The Court says, quoting from 2 Pomeroy's Eq., sec. 791: " 'If the intention has been expressed, it controls,' etc." In his dissenting opinion Mr. Justice McIver says: "But in addition to this, the fact that

the intention which, according to the authorities relied on, determine the question of merger, is expressed in writing, cannot be decisive. It may facilitate proof of the existence, but it cannot give it an effect which it would not otherwise have. According to those authorities, if the intention that there shall be no merger is ascertained, whether by express proof or implied from the circumstances, it controls. I do not see how it is possible that the mode in which it is ascertained can affect its nature or effects. It is true that there are some things which are required to be in writing, as, for example, a contract for the sale of land, which have no efficacy unless so expressed; but this is not of that class."

In *Navasso Guano Co.* v. *Richardson,* 26 S. C., 401, 2 S. E., 307, the mortgage was held to be merged by the acceptance of the mortgagee of the mortgagor's interest on the ground that there was not only no proof of an express agreement against merger, as in *Agnew* v. *R. R. Co., supra,* but not a word of evidence tending to show any intention against it.

While in this case the statement of the controlling influence of intention, quoted from Jones on Mortgages and Pomeroy's Eq. Jurisprudence, seems to be recognized, it is held to have no application to the case of a mortgagee taking a conveyance of the land as a satisfaction of his mortgage, for the reason that the mortgagee in this State has no estate in the land but a lien upon it, and anything he takes in satisfaction is payment, though it may prove afterward valueless in his hands. The case, therefore, rests on the absence of proof of intention that the mortgage should not be satisfied, and on the nature of a mortgage under our statute law.

In *Bleckley* v. *Branyon,* 26 S. C., 424, 429, 6 S. E., 291, referring to the satisfaction of a mortgage by merger, the Court says: "On account of this seeming hardship, it has been held that the mortgagee, thus purchasing the equity of redemption, may set up the prior mortgage against subsequent incumbrances, if the parties at the time of the transfer

intended and covenanted to prevent merger and to keep the mortgage open. See *Agnew* v. *R. R. Co.,* 24 S. C., 18, and authorities. So that the real question in this case is, whether the facts as to the intention of the parties bring it within the principle announced in the case of *Agnew* v. *R. R. Co.,* *supra.*" It is then held that there was not only no evidence of intention to keep the mortgage open, but that the facts led to a contrary conclusion. It is true in this case the Court said: "We cannot venture to go further in relieving a mortgagee who purchases than was indicated in the case of *Agnew* v. *R. R. Co., supra.*" But this clearly did not mean that there must be present the precise facts of *Agnew* v. *R. R. Co.* in order to prevent merger, for what was indicated in that case was the principle that merger would be prevented by an intention that it should not occur, either expressed or implied, because the interest of the mortgagee required it.

In *Agnew* v. *Renwick,* 27 S. C., 562, 573, 4 S. E., 223, Mr. Justice McIver uses this language: "Where parties have taken the precaution to protect themselves against the operation of the general rule, by an express covenant to that effect, they then bring themselves under the exception recognized in Agnew's case, beyond which this Court has said it will not venture to go; but where no such precaution has been taken, then the case must fall under the operation of the general rule." This cannot be regarded as having the force of *stare decisis,* for the reason that it is stated in the opinion it would be difficult, if not impossible, to find any evidence of intention to keep the mortgage open, and for the further convincing reason that a reference to the case will show the conclusion might well be sustained on other grounds, and the majority of the Court concurred in the result only.

Up to this point, therefore, it cannot fairly be said the Court ever adjudged that the intention would not control unless evidenced by an express agreement in writing; on the contrary, the tendency was to regard the fact of the intention controlling in whatever way it might be indicated. But in

the second appeal in *Bleckley* v. *Branyon,* 28 S. C., 445, 6 S. E., 291, the Court was unanimous, and it is there said to be settled in this State that " 'A mortgagee who buys the estate under mortgage not under process of foreclosure of his lien extinguishes the debt or claim, with lien on the land;' and that the only exception to this rule is the one recognized in *Agnew* v. *R. R. Co.,* 24 S. C., 18, whereby the mortgagee may, by express agreement in writing, protect himself from such a result."

There is a *dictum* to the same effect in *Parker* v. *Parker,* 52 S. C., 382, 29 S. E., 805, but so far from the result of the case resting on that ground, it was decided that the mortgage remained open.

While the case of *Michalson* v. *Myrick,* 47 S. C., 297, 25 S. E., 162, rests mainly on the ground that merger did not take place because the deed from which it was claimed to result was held to be absolutely void for fraud, yet the Court by a *dictum* gives sanction to the controlling effect in equity of intention, either expressed or implied.

The precise question was involved, however, in *Lipscomb* v. *Goode,* 57 S. C., 182, 35 S. E., 493, and an intention to keep the mortgage open was implied, because it was to the interest of the mortgagees that it should not be satisfied, and it was held there was no merger. *Powell* v. *Patrick,* 64 S. C., 190, 41 S. E., 894, is to the same effect.

In *Glenn* v. *Rudd,* 68 S. C., 102, 46 S. E., 555, the difficulty is pointed out of reconciling the cases in this State which intimate that to prevent merger an express contract against it is necessary, and those which hold the contract against it is sufficiently shown by proving the intention, and that the intention will be implied when the interests of the party against whom the merger is claimed require it. But the single point decided was that an agreement to keep the mortgage open after conveyance of the property to the mortgagee need not be in writing and incorporated in the deed of conveyance.

From this review we think it clear the later cases in this State establish the proposition, which as we have seen is in accord with the doctrine universally recognized in other jurisdictions, that in equity at least merger will not take place if opposed to the intention of the parties, affirmatively proved or to be implied from the fact that merger would be opposed to the interest of the person in whom the different estates or interests became united.

It is argued, however, that though in equity an intention that it shall not take place may prevent merger, at law whenever the greater and lesser estate coincide in the same person without any intermediate estate the rule that merger takes place is inflexible, and entirely unaffected by the intention. That is to say, if in this case Mrs. McCreary had made and Hunter had accepted a deed to the life estate, accompanying the execution with the most explicit expression of an intention on the part of both of them that merger should not result to the destruction of the contingent remainder, the life estate nevertheless would have been merged and the contingent remainder destroyed. It will hardly be thought that any such difference "at law" and "in equity" can be rested on a difference between the jurisdiction and practice of courts of law and courts of equity. If this supposed distinction ever had such a foundation it has been taken away by the adoption of the reformed procedure. Pomeroy's Code Remedies, secs. 94 to 103. The Court on its law side will recognize and enforce equitable rights wherever they are necessarily involved in the decision of a legal issue. For example, if A in a suit against B to recover possession of land, proves his own title, and B shows a deed from A for the land in dispute, this would be a complete bar to A's recovery; but if A then proves the deed to B was intended as a mortgage and the debt had been paid, he would still have the right to recover possession, and it makes no difference whatever whether we call his right legal or equitable. So if in an action to recover possession of land the title of the plaintiff depends upon an alleged mer-

ger, if the merger would be held by a court of equity not to have taken place because contrary to the intention, the plaintiff could not recover.

If it is contended the supposed distinction is founded on the difference between equitable and legal estates and interests, we can find no authority which compels us to recognize it. Indeed the doctrine that merger at law will take place without respect to the intention seems rather to have been taken for granted by the courts of equity than established by the decisions of the courts of law. The statement that at law the intention of the parties can have no effect seems to be founded on *Compton* v. *Oxenden,* 2 Vesey, Jr., 261, and *Forbes* v. *Moffatt,* 18 Vesey, 384; the Lord Chancellor in the former case using this language: "It is a clear principle, both at law and in equity, that where there is a confusion of rights, where debtor and creditor become the same person, there can be no right put into exertion; but there is an immediate merger. But it is true in equity, though there may be that which, if all was reduced to a legal right, would of necessity operate as a merger, this Court, acting upon the trust, will, on the intent, express or implied, preserve them distinct, and that confusion of rights will not take place." Similar expressions will be found in *Smith* v. *Roberts,* 91 N. Y., 470; *Bassett* v. *O'Brien,* 51 S. W., 107 (Mo.), and our own cases of *Agnew* v. *R. R. Co., Michalson* v. *Myrick* and *Lipscomb* v. *Goode, supra,* and other modern cases. But these expressions have the weight of *dicta* and nothing more, for in all the cases in which they are found the rule of equity and not the rule of law was involved and under discussion; and we have been able to find no law case in which it was adjudged that merger had taken place or would take place at law though opposed to the intention of the parties as established by the evidence. There is high authority against the existence of such rigidity in the rule of merger at law as is stated in the equity cases to which we have referred. "The intention is considered in merger at law, but it is not the governing principle of the

rule, as it is in equity; and the rule sometimes takes place without regard to the intention, as in the instance mentioned by Lord Coke." 4 Kent's Com., *102. So far as we can discover, there is no reference in Coke on Littleton, where the general doctrine of merger is laid down, as to the effect of intention. In Appeal of Fink, 18 Atl., 621 (Pa.), it was held where a widow holds dower, which is a legal interest in lands, the fee to which descend to her by the death of her son, merger of the two estates becomes a question of intent, and cannot take place against the wishes of the widow, and will not be presumed against her interest.

To the same effect is *McLeery* v. *McLeery*, 20 Am. Rep., 683 (Me.), where it is said the tendency in the courts has been to admit and apply the same principle in law and in equity. It is true, in *Youmans* v. *Wagener & Co.*, 30 S. C., 302, 9 S. E., 106, it was held that the widow's dower was merged when she acquired the fee, but there was no proof of a contrary intention, and no reference to the effect of intention.

In *Flanigan* v. *Sable*, 46 N. W., 854 (Minn.), the action was on promissory notes, and on the question of merger the Court says: "The distinction in practice between law and equity having been abolished, and both legal and equitable remedies being now administered by the same Court, and in the same action, there is no reason why the rule at law, which was merely technical, should obtain in any case; but the equity rule should always be applied, regardless of the form of action." It is said in 20 Am. & En. Ency., 590: "This distinction appears to be of waning importance, as now in the main the equitable doctrines of merger have superseded the legal doctrines even in courts of law." *Ib.*, 591 and 595; note to *Jones* v. *Morey*, 3 Lead. Cases Amer. Law Real Property, 236.

From the inception of the rule that merger would take place and the contingent remainder thereby defeated when the owner of the fee acquired the preceding particular estate, an exception was allowed when the will itself gave the par-

ticular estate and the fee to the same person, for the reason that to apply the rule in that case would defeat the intention of the testator. Fearne on Remainders, 340-344; 2 Wash. on Real Prop., 638-639. The same exception was applied to a deed to avoid defeating the intention of the grantor in *Burton* v. *Barclay,* 7 Bing., 745, 20 E. C. L., 315. Since the law holds it to be practically possible for one person to be the owner of a separate life estate and of the fee at the same time, though this is technically impossible, in order to save the contingent remainder and thus give effect to the intention of the testator or grantor, as expressed in the will or the deed, it would be difficult to find any sound reason against giving a like effect to the common intention of the separate owners of the life estate and of the fee simple, when the owner of the fee acquires the life estate. The whole doctrine of merger is founded on the reasoning that it is technically impossible for a man to hold a valid charge on property which he himself owns, or a life estate in lands to which he has a fee simple title. If the technical argument may be overcome for the sake of the intention in one case, it would be difficult to find just reason to disregard the intention in the other. To do so without reason would be a reproach to the administration of justice.

Obviously nothing but precedent from which there is no escape would justify the establishment of one rule as to merger as equitable and another as legal. The tendency of the law is to conform to equity. "Since the doctrines of equity began to react upon the law, and especially since the impulse given by the brilliant career of Lord Mansfield, the common law courts have consciously adopted and applied, as far as possible, purely equitable notions—not so much the technical equity of the Court of Chancery, but the principles of natural justice—in their decision of new cases, and in the development of the law, until a large part of its rules are as truly equitable and righteous in their nature as those administered by the Chancellor." 1 Pomeroy's Eq. Jurisp., sec. 69.

We conclude there is no controlling authority that the intention is not to be regarded in an issue of law or as to legal estates, but on the contrary the tendency of modern authority is to regard the intention controlling at law as well as in equity. There is certainly no reason to be found for any distinction.

It is not necessary in this case to decide whether "in law" the intention against merger is to be implied from the fact that it would be contrary to the interest of the party in whom two estates are united for one to be merged in the other, for assuming that the burden is on the plaintiffs to affirmatively prove the intention against it, we think such intention is clearly established by the evidence, and nothing was offered to disprove it.

No deed from Mrs. McCreary to Morris Hunter was offered in evidence, defendant's claim that he acquired the life estate of Mrs. McCreary being based entirely on proof of possession. Mr. Peter A. Brunson, a witness of the highest respectability, testified that Morris Hunter was in possession of the land in 1835 claiming it as his own. It is impossible, however, that he was making any such claim *against Mrs. McCreary* at that time, for he writes to her on February 20, 1836, about the land, referring to it as "your land." In addition to this, the will directed him and the other executors to "retain and manage" the land for Mrs. McCreary, then Miss Coleman, until "she arirves at the age of twenty-one years or marriage," and there was no proof of any notice to her of adverse holding. *Floyd v. Minstey,* 7 Rich., 181. When Hunter went into possession, therefore, in 1835, he held it for Mrs. McCreary, and his subsequent holding would be regarded permissive without proof to the contrary. The witnesses, Jas. G. Hutchinson and Albert Sawyer, say they knew of his possession, but testify nothing of the claim under which he held.

The defendants' claim of adverse possession by Morris Hunter against Mrs. McCreary, therefore, rests on the evidence of Henry Perkins and H. L. Poston, and they cannot

take the benefit of this evidence without its qualification. Both these witnesses say Hunter was in possession claiming only the life interest of Mrs. McCreary, saying the "heirs were out west," clearly referring to the children of Mrs. McCreary, plaintiffs in this action.  The proof was plenary and undisputed of declarations to the same effect made by Thos. P. Lide, who was afterwards in possession under a sheriff's deed purporting to convey the interest of Hunter; and as late as 1885 the defendant A. C. Coggeshall wrote Mrs. McCreary, saying: "I own a part of your lifetime interest in a tract of land in this county, which was sold to Mr. Thos. P. Lide in 1858 by the sheriff to satisfy a claim of Mr. Hopkins P. Charles against Maurice W. Hunter, Esq.  I would like to either buy the interest of your heirs or sell them mine.  *  *  *  I would like for them to make me an offer to either buy or sell."  Even if there had been testimony which left something to go to the jury as to the intention of Morris Hunter, this could not help defendants, because the claim of title in him acquired by possession adverse to Mrs. McCreary is without support, and therefore the life estate did not merge in the fee while he held the fee. His possession could not have begun to be adverse until after his letter to Mrs. McCreary, dated February 20, 1836, in which he acknowledges her title and right.  Before this date, on December 30, 1835, Mrs. McCreary, *nee* Coleman, was married and remained under the disability of coverture until 1861, four years after the death of Morris Hunter. The law will not presume a deed from her while under this disability.  2 Wash., 316.  Nor could title be acquired against her by adverse possession. *Jones* v. *Reeves,* 6 Rich., 132.

If Thos. P. Lide acquired the fee by his purchase of Morris Hunter's interest at sheriff's sale and he and his successors in possession acquired the life estate of Mrs. McCreary by adverse possession or presumption of a deed from her, this possession was accompanied and qualified by

the statement that the contingent remainder of the plaintiffs was unclaimed and unaffected.

If Hunter or any of his successors who had acquired his fee in the land had claimed under a deed from Mrs. McCreary, expressly stipulating the contingent remainder should not be destroyed by its execution, this beyond doubt would be an expression of intention against merger, because by merger the remainder would necessarily have been destroyed; and when the claim to the life estate is based on adverse possession accompanied by a declaration that the contingent remainder was unaffected, the result cannot be different.

The charge that merger did not take place and the contingent remainder was not defeated, was right, not for the reason stated by the Circuit Judge, but because it was the understanding and intention of all parties concerned that there was no merger, and that the contingent remaindermen should have the land upon the death of the life tenant.

Before ending the discussion of this point it may be well to say that if any of the grantees claiming under Morris W. Hunter had acquired the land without knowledge of the intention that there should be no merger, and relying upon the rule that ordinarily in such conditions the life estate is merged and the contingent remainder destroyed, a very different question would have been presented.

The defendants objected to the introduction of a letter from Morris W. Hunter to Mary A. McCreary, dated 20th February, 1836, offered as an admission by him that he had not acquired her life estate, on the ground that the genuineness was not proved. The letter was an ancient document and required no proof. 1 Elliott on Evidence, sec. 421. It was found among the papers of Mrs. McCreary, the addressee, nearly seventy years after it was written, and to solve any doubt of its genuineness it was competent to introduce for the purpose of comparison the records of the ordinary's office presumably written by Hunter, the incumbent of that office. It is said in *Cantey*

v. *Platt,* 2 McCord, 261: "When a writing is offered in evidence, so antiquated as to render it difficult if not impossible to produce a witness who had ever seen the person write, whose signature is attached to the writing, justice would be defeated if a comparison of handwriting were not permitted. In the case of *Allesbrook* v. *Roach,* 1 Esp. Rep., 351, the jury were allowed to examine papers admitted to be the party's handwriting to compare them with the writing in question, and to draw their own conclusions. And in the case of *Brumand Rowlins,* 7 East., 232, the signature in an entry made by a person long since dead, was allowed to be compared with another signature of the same person in a deed of settlement. So, also, where a parson's books were produced to prove a *modus,* the parson having been long dead, a witness who had examined the parish books, in which the same parson's name was written, was permitted to swear to the similitude of the handwriting (Bull, N. P., 236)."

Objection was made also to the introduction of the record of a deed from Morris Hunter to Thomas Hunter, dated February 18, 1820, purporting to be probated before "George Bruce, U. Q.," on the ground that the letters "U. Q." did not indicate the official designation of any officer authorized at that time to take a probate. The statute of 1804, 5 Stat., 479, enacted, "Clerks of the several courts of record of this State * * * shall be and they are hereby declared to be *ex officio* Justices of the Quorum." The letters here used no doubt signified *unum quorum.* The probate of deeds taken not long before and just after the execution of this deed purport to have been made before "George Bruce, Clerk of the Court and one of the *Quorum ex officio.*" Aside from any proof on the subject, the Court of Common Pleas could take judicial notice that George Bruce was its Clerk, and *ex officio* justice of the quorum. A justice of the quorum was a magistrate and, therefore, authorized to take probates under the act of 1788, 7 Stat., 247. The omission of his official title did

not affect the validity of the probate. *Bank* v. *McMahon,* 37 S. C., 309.

The letter of A. C. Coggeshall to the life tenant, taken in connection with the several deeds, the parol evidence of successive possessions and the admissions of those who successively held the land, was certainly evidence sufficient to justify the Circuit Judge in refusing to grant a motion for nonsuit made on the ground of a total failure to prove the *locus in quo*.

The motion for a new trial on "the ground that the verdict of the jury was against W. D. Coggeshall as well as A. C. Coggeshall, notwithstanding the plaintiffs proved that the said W. D. Coggeshall derived his title from one Thomas Rogers, a different source of title altogether from the title of A. C. Coggeshall, which might have been superior to the title of Mary Ann Coleman or these plaintiffs, and in no way connected therewith," was properly refused. There was evidence that Thomas Hunter and those who claimed under his will, subject to the rights of the plaintiffs, were in possession of the land for a much longer period than was necessary to establish the presumption of a good title against all the world. The right of the plaintiffs to recover possession against A. C. Coggeshall, the last of these successive holders under the will, necessarily embraced the right to recover against W. D. Coggeshall, because any independent title he or his grantors may have held was acquired by the life tenant and those who held under her by the long stretch of successive possessions adverse to all the world except the plaintiffs, the contingent remaindermen.

The sixth exception was abandoned, and as to it no opinion is expressed.

The judgment of this Court is, that the judgment of the Circuit Court be affirmed.